UNITED STATES *v.* VON'S GROCERY CO. ET AL.

No. 303.  Argued March 22, 1966.—Decided May 31, 1966.

*Richard A. Posner* argued the cause for the United States. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Turner, Robert B. Hummel, James J. Coyle* and *John F. Hughes.*

*William W. Alsup* argued the cause for appellees. With him on the brief were *Warren M. Christopher* and *William W. Vaughn.*

*Henry J. Bison, Jr.,* argued the cause and filed a brief for the National Association of Retail Grocers of the United States, as *amicus curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

On March 25, 1960, the United States brought this action charging that the acquisition by Von's Grocery Company of its direct competitor Shopping Bag Food Stores, both large retail grocery companies in Los Angeles, California, violated § 7 of the Clayton Act which, as amended in 1950 by the Celler-Kefauver Anti-Merger Act, provides in relevant part:

> "That no corporation engaged in commerce . . . shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." [1]

On March 28, 1960, three days later, the District Court refused to grant the Government's motion for a temporary restraining order and immediately Von's took over all of Shopping Bag's capital stock and assets including 36 grocery stores in the Los Angeles area. After

---

[1] 38 Stat. 731, as amended by 64 Stat. 1125, 15 U. S. C. § 18 (1964 ed.).

hearing evidence on both sides, the District Court made findings of fact and concluded as a matter of law that there was "not a reasonable probability" that the merger would tend "substantially to lessen competition" or "create a monopoly" in violation of § 7. For this reason the District Court entered judgment for the defendants. 233 F. Supp. 976, 985. The Government appealed directly to this Court as authorized by § 2 of the Expediting Act.[2] The sole question here is whether the District Court properly concluded on the facts before it that the Government had failed to prove a violation of § 7.

The record shows the following facts relevant to our decision. The market involved here is the retail grocery market in the Los Angeles area. In 1958 Von's retail sales ranked third in the area and Shopping Bag's ranked sixth. In 1960 their sales together were 7.5% of the total two and one-half billion dollars of retail groceries sold in the Los Angeles market each year. For many years before the merger both companies had enjoyed great success as rapidly growing companies. From 1948 to 1958 the number of Von's stores in the Los Angeles area practically doubled from 14 to 27, while at the same time the number of Shopping Bag's stores jumped from 15 to 34. During that same decade, Von's sales increased fourfold and its share of the market almost doubled while Shopping Bag's sales multiplied seven times and its share of the market tripled. The merger of these two highly successful, expanding and aggressive competitors created the second largest grocery chain in Los Angeles with sales of almost $172,488,000 annually. In addition the findings of the District Court show that

---

[2] 32 Stat. 823, as amended by 62 Stat. 989, 15 U. S. C. § 29 (1964 ed.).

the number of owners operating single stores in the Los Angeles retail grocery market decreased from 5,365 in 1950 to 3,818 in 1961. By 1963, three years after the merger, the number of single-store owners had dropped still further to 3,590.[3] During roughly the same period, from 1953 to 1962, the number of chains with two or more grocery stores increased from 96 to 150. While the grocery business was being concentrated into the hands of fewer and fewer owners, the small companies were continually being absorbed by the larger firms through mergers. According to an exhibit prepared by one of the Government's expert witnesses, in the period from 1949 to 1958 nine of the top 20 chains acquired 126 stores from their smaller competitors.[4] Figures of a principal defense witness, set out below, illustrate the many acquisitions and mergers in the Los Angeles grocery industry from 1954 through 1961 including acquisitions made by Food Giant, Alpha Beta, Fox, and

[3] Despite this steadfast concentration of the Los Angeles grocery business into fewer and fewer hands, the District Court, in Finding of Fact No. 80, concluded as follows:

"There has been no increase in concentration in the retail grocery business in the Los Angeles Metropolitan Area either in the last decade or since the merger. On the contrary, economic concentration has decreased . . . ."

This conclusion is completely contradicted by Finding No. 23 which makes plain the steady decline in the number of individual grocery store owners referred to above. It is thus apparent that the District Court, in finding No. 80, used the term "concentration" in some sense other than a total decrease in the number of separate competitors which is the crucial point here.

[4] Appellees, in their brief, claim that 120 and not 126 stores changed hands in these acquisitions:

"It should also be noted here that the exhibit is in error in showing an acquisition by Food Giant *from itself* of six stores doing an annual volume of $31,700,000. Actually this was simply a change of name by Food Giant . . . ."

Mayfair, all among the 10 leading chains in the area.[5] Moreover, a table prepared by the Federal Trade Commission appearing in the Government's reply brief, but not a part of the record here, shows that acquisitions and mergers in the Los Angeles retail grocery market have continued at a rapid rate since the merger.[6] These facts alone are enough to cause us to conclude contrary to the District Court that the Von's-Shopping Bag merger did violate § 7. Accordingly, we reverse.

From this country's beginning there has been an abiding and widespread fear of the evils which flow from monopoly—that is the concentration of economic power in the hands of a few. On the basis of this fear, Congress in 1890, when many of the Nation's industries were already concentrated into what it deemed too few hands, passed the Sherman Act in an attempt to prevent further concentration and to preserve competition among a large number of sellers. Several years later, in 1897, this Court emphasized this policy of the Sherman Act by calling attention to the tendency of powerful business combinations to restrain competition "by driving out of business the small dealers and worthy men whose lives have been spent therein, and who might be unable to readjust themselves in their altered surroundings." *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 323.[7] The Sherman Act failed to protect the smaller businessmen

---

[5] These figures as they appear in a table in the Brief for the United States show acquisitions of retail grocery stores in the Los Angeles area from 1954 to 1961: See Appendix, Table 1, substantially reproducing the above-mentioned table.

[6] See Appendix, Table 2.

[7] Later, in 1945, Judge Learned Hand, reviewing the policy of the antitrust laws and other laws designed to foster small business, said, "Throughout the history of these statutes it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of

from elimination through the monopolistic pressures of large combinations which used mergers to grow ever more powerful.  As a result in 1914 Congress, viewing mergers as a continuous, pervasive threat to small business, passed § 7 of the Clayton Act which prohibited corporations under most circumstances from merging by purchasing the stock of their competitors.  Ingenious businessmen, however, soon found a way to avoid § 7 and corporations began to merge simply by purchasing their rivals' assets. This Court in 1926, over the dissent of Justice Brandeis, joined by Chief Justice Taft and Justices Holmes and Stone approved this device for avoiding § 7 [8] and mergers continued to concentrate economic power into fewer and fewer hands until 1950 when Congress passed the Celler-Kefauver Anti-Merger Act now before us.

Like the Sherman Act in 1890 and the Clayton Act in 1914, the basic purpose of the 1950 Celler-Kefauver Act was to prevent economic concentration in the American economy by keeping a large number of small competitors in business.[9]  In stating the purposes of their bill, both of its sponsors, Representative Celler and Senator Kefauver, emphasized their fear, widely shared by other members of Congress, that this concentration was rapidly driving the small businessman out of the market.[10]  The period from 1940 to 1947, which was at

industry in small units which can effectively compete with each other." *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 429.

[8] *Thatcher Manufacturing Co.* v. *Federal Trade Commission,* 272 U. S. 554, 560.

[9] See, *e. g., U. S.* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 362–363; *United States* v. *Alcoa,* 377 U. S. 271, 280.

[10] Representative Celler, in introducing the bill on the House floor, remarked:

"Small, independent, decentralized business of the kind that built up our country, of the kind that made our country great, first, is

the center of attention throughout the hearings and debates on the Celler-Kefauver bill, had been characterized by a series of mergers between large corporations and their smaller competitors resulting in the steady erosion of the small independent business in our economy.[11] As we said in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 315, "The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy." To arrest this "rising tide" toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers. It both revitalized § 7 of the Clayton Act by "plugging its loophole" and broadened its scope so

---

fast disappearing, and second, is being made dependent upon monster concentration." 95 Cong. Rec. 11486.

Senator Kefauver expressed the same fear on the Senate floor:

"I think that we are approaching a point where a fundamental decision must be made in regard to this problem of economic concentration. Shall we permit the economy of the country to gravitate into the hands of a few corporations . . . ? Or on the other hand are we going to preserve small business, local operations, and free enterprise?" 96 Cong. Rec. 16450.

References to a number of other similar remarks by other Congressmen are collected in *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 316, n. 28.

[11] H. R. Rep. No. 1191, 81st Cong., 1st Sess., p. 3, described this characteristic of the merger movement as follows:

". . . the outstanding characteristic of the merger movement has been that of large corporations buying out small companies, rather than smaller companies combining together in order to compete more effectively with their larger rivals. More than 70 percent of the total number of firms acquired during 1940–47 have been absorbed by larger corporations with assets of over $5,000,000. In contrast, fully 93 percent of all the firms bought out held assets of less than $1,000,000. Some 33 of the Nation's 200 largest industrial corporations have bought out an average of 5 companies each, and 13 have purchased more than 10 concerns each."

as not only to prohibit mergers between competitors, the effect of which "may be substantially to lessen competition, or to tend to create a monpoly" but to prohibit all mergers having that effect. By using these terms in § 7 which look not merely to the actual present effect of a merger but instead to its effect upon future competition, Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever-increasing concentration through mergers.[12]

The facts of this case present exactly the threatening trend toward concentration which Congress wanted to halt. The number of small grocery companies in the Los Angeles retail grocery market had been declining rapidly before the merger and continued to decline rapidly afterwards. This rapid decline in the number of grocery store owners moved hand in hand with a large number of significant absorptions of the small companies by the larger ones. In the midst of this steadfast trend toward concentration, Von's and Shopping Bag, two of the most successful and largest companies in the area, jointly owning 66 grocery stores merged to become the second largest chain in Los Angeles. This merger cannot be defended on the ground that one of the companies was about to fail or that the two had to merge to save themselves from destruction by some larger and more powerful competitor.[13] What we have on the con-

---

[12] See, e. g., *Brown Shoe Co.* v. *United States,* 370 U. S., at 346; *U. S.* v. *Philadelphia Nat. Bank,* 374 U. S., at 362. See also *United States* v. *du Pont & Co.,* 353 U. S. 586, 597, interpreting § 7 before the Celler-Kefauver Anti-Merger amendment.

[13] See *Brown Shoe Co.* v. *United States,* 370 U. S., at 319.

trary is simply the case of two already powerful companies merging in a way which makes them even more powerful than they were before. If ever such a merger would not violate § 7, certainly it does when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors which is exactly the sort of trend which Congress, with power to do so, declared must be arrested.

Appellees' primary argument is that the merger between Von's and Shopping Bag is not prohibited by § 7 because the Los Angeles grocery market was competitive before the merger, has been since, and may continue to be in the future. Even so, § 7 "requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their 'incipiency.'" *U. S.* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 362. It is enough for us that Congress feared that a market marked at the same time by both a continuous decline in the number of small businesses and a large number of mergers would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed. Congress passed the Celler-Kefauver Act to prevent such a destruction of competition. Our cases since the passage of that Act have faithfully endeavored to enforce this congressional command.[14] We adhere to them now.

---

[14] See, *e. g., Brown Shoe Co.* v. *United States,* 370 U. S. 294; *U. S.* v. *Philadelphia Nat. Bank,* 374 U. S. 321; *United States* v. *El Paso Gas Co.,* 376 U. S. 651; *United States* v. *Alcoa,* 377 U. S. 271; *United States* v. *Continental Can Co.,* 378 U. S. 441; *FTC* v. *Consolidated Foods,* 380 U. S. 592.

Here again as in *United States* v. *El Paso Gas Co.,* 376 U. S. 651, 662, since appellees "have been on notice of the antitrust charge from almost the beginning . . . we not only reverse the judgment below but direct the District Court to order divestiture without delay." See also *United States* v. *du Pont & Co.,* 366 U. S. 316; *United States* v. *Alcoa,* 377 U. S. 271, 281.

*Reversed and remanded.*

MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT.

TABLE 1.

*Food store acquisitions in the Los Angeles metropolitan area 1954–61*

| Year | Acquiring firm | Acquired firm | Number of stores acquired |
|---|---|---|---|
| 1957 | Piper Mart | Bi-Right & Big Bear | 3 |
| 1958 | Mayfair | Bob's Supermarket | 7 |
| 1961 | Better Foods | Border's Markets | 3 |
| 1954 | Kory's Markets | Carty Brothers | 8 |
| 1958 | Food Giant | Clark Markets | 10 |
| 1956 | Fox | Desert Fair | 4 |
| 1959 | Lucky | Hiram's | 6 |
| 1958 | Fox | Iowa Pork Shops | 11 |
| 1961 | Food Giant (and others) | McDaniel's Markets | 16 |
| 1957 | Food Giant | Panorama Markets | 3 |
| 1958 | Pix | Patton's Mkts | 3 |
| 1958 | Alpha Beta | Raisin Markets | 13 |
| 1960 | Piggly Wiggly | Rankins Markets | 4 |
| 1959 | Pix | S & K Markets | 2 |
| 1960 | Von's | Shopping Bag | 37 |
| 1959 | Pix | Shop Right Markets | 3 |
| 1958 | Yor-Way | C. S. Smith | 5 |
| 1957 | Food Giant | Toluca Marts | 2 |
| 1957 | Mayfair | U-Tell-Em Markets | 10 |
| | Total | | 150 |

TABLE 2.

*Food store acquisitions in the Los Angeles metropolitan area 1961–64* [1]

| Year | Acquiring company | Acquired company (or stores) | | | Type of acquisition | |
|---|---|---|---|---|---|---|
| | | Name | Number of stores | Sales (thousands) [2] | Horizontal | Other |
| 1961 | Acme Markets | Alpha Beta Food Markets | 45 | $79,042 | | X |
| | Boys Markets | Korys Markets | 5 | 10,000 | X | |
| | Food Giant Markets | McDaniels Markets | 9 | 21,500 | X * | |
| | Mayfair Markets | Yorway Markets | 1 | 1,500 | X | |
| | | Alpha Beta Food Markets | 1 | 1,700 | X | |
| 1962 | Mayfair Markets | Schaubs Market | 1 | 1,800 | X | |
| | | Fox Markets | 1 | 2,200 | X | |
| | Ralph's Grocery Co | Imperial Supreme Markets | 1 | 916 | X | |
| 1963 | Food Fair Stores | Fox Markets | 22 | 44,419 | | X |
| | Kroger | Market Basket | 53 | 110,860 | | X |
| | Mayfair Markets | Bi Rite Markets | 1 | 2,569 | X | |
| | | Dales Food Market | 1 | 2,200 | X | |
| | | Food Giant Markets | 1 | 1,700 | X | |
| 1964 | Albertson's, Inc | Greater All American | 14 | 30,308 | | X |
| | Mayfair Markets | Gateway Market | 4 | 8,000 | X | |
| | | Pattons Markets | 4 | 10,400 | X | |
| | Ralph's Grocery Co | Cracker Barrel Super-market. | 1 | 1,000 | X | |
| | Food Giant Markets | McDaniels Markets | 7 | 18,350 | X | |
| | Total horizontal mergers. | | 38 | 83,835 | | |
| | Total market extension mergers. | | 134 | 264,629 | | |

[1] Consists of Los Angeles and Orange Counties. (1963 census defined the Los Angeles metropolitan area as Los Angeles County only.)

[2] In most cases, sales are for the 12-month period prior to acquisition.

*According to a statement made by Von's counsel at oral argument, this acquisition did not take place in 1961, but instead Food Giant bought seven of McDaniel's stores in 1964. The acquisition in 1964 is listed in this table.

MR. JUSTICE WHITE, concurring.

As I read the Court's opinion, which I join, it does not hold that in any industry exhibiting a decided trend towards concentration, any merger between competing firms violates § 7 unless saved by the failing company doctrine; nor does it declare illegal each and every merger in such an industry where the resulting firm has as much

as a 7.5% share of the relevant market. But here, in 1958 before the merger, the largest firm had 8% of the sales, Von's was third with 4.7% and Shopping Bag was sixth with 4.2%. The four largest firms had 24.4% of the market, the top eight had 40.9% and the top 12 had 48.8% as compared with 25.9%, 33.7% and 38.8% in 1948. All but two of the top 10 firms in 1958 were very probably also among the top 10 in 1948 or had acquired a firm that was among the top 10. Further, all but three of the top 10 had increased their market share between 1948 and 1958 and those which gained gained more than the three lost. Also, although three companies declined in market share their total sales increased in substantial amounts.

Given a trend towards fewer and fewer sellers which promises to continue, it is clear to me that where the eight leading firms have over 40% of the market, any merger between the leaders or between one of them and a lesser company is vulnerable under § 7, absent some special proof to the contrary. Here Von's acquired Shopping Bag. Both were among the eight largest companies, both had grown substantially since 1948 and they were substantial competitors. After the merger the four largest firms had 28.8%, the eight largest had 44% and the 12 largest had 50%. The merger not only disposed of a substantial competitor but increased the concentration in the leading firms. In my view the Government sufficiently proved that the effect of this merger may be substantially to lessen competition or to tend to create a monopoly.

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN joins, dissenting.

We first gave consideration to the 1950 amendment of § 7 of the Clayton Act in *Brown Shoe Co.* v. *United States,* 370 U. S. 294. The thorough opinion THE CHIEF JUSTICE wrote for the Court in that case made two

things plain: First, the standards of § 7 require that every corporate acquisition be judged in the light of the contemporary economic context of its industry.[1] Second, the purpose of § 7 is to protect competition, not to protect competitors, and every § 7 case must be decided in the light of that clear statutory purpose.[2] Today the Court turns its back on these two basic principles and on all the decisions that have followed them.

The Court makes no effort to appraise the competitive effects of this acquisition in terms of the contemporary economy of the retail food industry in the Los Angeles area.[3] Instead, through a simple exercise in sums, it finds that the number of individual competitors in the market has decreased over the years, and, apparently on the theory that the degree of competition is invariably proportional to the number of competitors, it holds that

---

[1] "[A] merger had to be functionally viewed, in the context of its particular industry." *Brown Shoe Co.* v. *United States,* 370 U. S., at 321–322. "[B]oth the Federal Trade Commission and the courts have, in the light of Congress' expressed intent, recognized the relevance and importance of economic data that places any given merger under consideration within an industry framework almost inevitably unique in every case." *Id.,* at 322, n. 38.

[2] "Taken as a whole, the legislative history illuminates congressional concern with protection of *competition,* not *competitors,* and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." *Brown Shoe Co.* v. *United States, supra,* at 320.

[3] This is the first case to reach the Court under the 1950 amendment to § 7 that involves a merger between firms engaged solely in retail food distribution. Kaysen & Turner, Antitrust Policy 40 (1959), have discussed this industry in the following terms:

"As a guess, we can say that the most important distributive trades, especially the food trades, are structurally unconcentrated in the metropolitan areas . . . . [T]he significance of structural oligopoly in terms of policy is far different in [these trades] than in manufacturing and mining. . . . [T]he traditional view that the local-market industries are essentially competitive in character is probably correct . . . ."

this historic reduction in the number of competing units is enough under § 7 to invalidate a merger within the market, with no need to examine the economic concentration of the market, the level of competition in the market, or the potential adverse effect of the merger on that competition. This startling *per se* rule is contrary not only to our previous decisions, but contrary to the language of § 7, contrary to the legislative history of the 1950 amendment, and contrary to economic reality.

Under § 7, as amended, a merger can be invalidated if, and only if, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." No question is raised here as to the tendency of the present merger to create a monopoly. Our sole concern is with the question whether the effect of the merger may be substantially to lessen competition.

The principal danger against which the 1950 amendment was addressed was the erosion of competition through the cumulative centripetal effect of acquisitions by large corporations, none of which by itself might be sufficient to constitute a violation of the Sherman Act. Congress' immediate fear was that of large corporations buying out small companies.[4] A major aspect of that fear was the perceived trend toward absentee ownership of local business.[5] Another, more generalized, congres-

---

[4] See, *e. g.*, H. R. Rep. No. 1191, 81st Cong., 1st Sess., p. 3, quoted in footnote 11 of the Court's opinion. Mention of the retail food industry is notably absent in the legislative history. Although it is clear that, in addition to the already highly oligopolized industries, Congress was also concerned with trends toward concentration in industries that were still highly fragmented, this case involves not even a remote approach to the "monster concentration" of which Representative Celler spoke in introducing the 1950 amendment in the House of Representatives. 95 Cong. Rec. 11486.

[5] See, *e. g.*, Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on H. R. 2734, 81st Cong., 1st Sess., p. 12 (remarks of Senator Kefauver).

sional purpose revealed by the legislative history was to protect small businessmen and to stem the rising tide of concentration in the economy.[6] These goals, Congress thought, could be achieved by "arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Brown Shoe Co.* v. *United States, supra,* at 317.

The concept of arresting restraints of trade in their "incipiency" was not an innovation of the 1950 amendment. The notion of incipiency was part of the report on the original Clayton Act by the Senate Committee on the Judiciary in 1914, and it was reiterated in the Senate report in 1950.[7] That notion was not left undefined.

---

[6] Much of the fuel for the congressional debates on concentration in the American economy was derived from a contemporary study by the Federal Trade Commission on corporate acquisitions between 1940 and 1947. See Report of the Federal Trade Commission on the Merger Movement: A Summary Report (1948). A critical study of the FTC report, published while the 1950 amendment was pending in Congress, concluded that the effect of the recent merger movement on concentration had been slight. Lintner & Butters, Effect of Mergers on Industrial Concentration, 1940–1947, 32 Rev. of Econ. & Statistics 30 (1950). Two economists for the Federal Trade Commission later acquiesced in that conclusion. Blair & Houghton, The Lintner-Butters Analysis of the Effect of Mergers on Industrial Concentration, 1940–1947, 33 Rev. of Econ. & Statistics 63, 67, n. 12 (1951).

[7] See S. Rep. No. 698, 63d Cong., 2d Sess., p. 1:

"Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890 [the Sherman Act], or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation."

See also S. Rep. No. 1775, 81st Cong., 2d Sess., pp. 4–5: "The intent here, as in other parts of the Clayton Act, is to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding;"

The legislative history leaves no doubt that the applicable standard for measuring the substantiality of the effect of a merger on competition was that of a "reasonable probability" of lessening competition.[8] The standard was thus more stringent than that of a "mere possibility" on the one hand and more lenient than that of a "certainty" on the other.[9] I cannot agree that the retail grocery

---

*id.,* p. 6: "The concept of reasonable probability conveyed by these words ['may be'] is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act."

Thus, the Senate Reports on both the original Clayton Act and the 1950 amendment carefully delineate the "incipiency" with which the provisions are concerned as that of monopolization or classical restraints of trade under the Sherman Act. The notion that "incipiency" might be expanded to refer also to a lessening of competition first appeared in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 317.

[8] The Senate Report is clear on this point:

"The use of these words ['may be substantially to lessen competition'] means that the bill, if enacted, would not apply to the mere possibility but only to the reasonable probability of the prescribed [*sic*] effect . . . . The words 'may be' have been in section 7 of the Clayton Act since 1914. The concept of reasonable probability conveyed by these words is a necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." S. Rep. No. 1775, 81st Cong., 2d Sess., p. 6.

See also 96 Cong. Rec. 16453 (remarks of Senator Kefauver). Cf. 51 Cong. Rec. 14463–14464 (amendment of Senator Reed).

[9] Although Congress eschewed exclusively mathematical tests for assessing the impact of a merger, it offered several generalizations indicative of the sort of merger that might be proscribed, *e. g.*: Whether the merger eliminated an enterprise that had been a substantial factor in competition; whether the increased size of the acquiring corporation threatened to give it a decisive advantage over competitors; whether an undue number of competing enterprises had been eliminated. H. R. Rep. No. 1191, 81st Cong., 1st Sess., p. 8. See *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 321,

business in Los Angeles is in an incipient or any other stage of a trend toward a lessening of competition, or that the effective level of concentration in the industry has increased. Moreover, there is no indication that the present merger, or the trend in this industry as a whole, augurs any danger whatsoever for the small businessman. The Court has substituted bare conjecture for the statutory standard of a reasonable probability that competition may be lessened.[10]

The Court rests its conclusion on the "crucial point" that, in the 11-year period between 1950 and 1961, the number of single-store grocery firms in Los Angeles decreased 29% from 5,365 to 3,818.[11] Such a decline

n. 36. Only the first of these generalizations is arguably applicable to the present merger; the market-extension aspects of the merger, as well as the evidence of Shopping Bag's declining profit margin and weak price competition, suggest that any conclusion under this test would be equivocal. See *infra,* pp. 295–296; 298, n. 30. Senator Kefauver stated explicitly on the Senate floor that the mere elimination of competition between the merged firms would not make the acquisition illegal; rather, "the merger would have to have the effect of lessening competition generally." 96 Cong. Rec. 16456.

[10] Eighteen years ago, a dictum in *Federal Trade Commission* v. *Morton Salt Co.,* 334 U. S. 37, 46, adverted to a "reasonable possibility" as the appropriate standard for the corresponding language ("may be to substantially lessen competition") under § 3 of the Clayton Act, 15 U. S. C. § 14. The dictum provoked a sharp dissent in that case, *id.,* at 55, 57–58, and the Court subsequently withdrew it, *Standard Oil Co.* v. *United States,* 337 U. S. 293, only to reinstate it again today. This issue, which appeared settled at the time of the 1950 amendment, provoked an acrimonious exchange during the Senate hearings. Hearings before a Subcommittee of the Senate Committee on the Judiciary on H. R. 2734, 81st Cong., 1st & 2d Sess., pp. 160–168.

[11] The decline continued at approximately the same rate to 1963, the last year for which data are available, when there were 3,590 single-store grocery firms in the area. The record contains no breakdown of the figures on single-store concerns. In an extensive study of the retail grocery industry on a national scale, the Federal Trade

should, of course, be no more than a fact calling for further investigation of the competitive trend in the industry. For the Court, however, that decline is made the end, not the beginning, of the analysis. In the counting-of-heads game played today by the Court, the reduction in the number of single-store operators becomes a yardstick for automatic disposition of cases under § 7.

I believe that even the most superficial analysis of the record makes plain the fallacy of the Court's syllogism that competition is necessarily reduced when the bare number of competitors has declined.[12] In any meaningful sense, the structure of the Los Angeles grocery market remains unthreatened by concentration. Local competition is vigorous to a fault, not only among chain stores

---

Commission found that between 1939 and 1954 the total number of grocery stores in the United States declined by 109,000, or 28%. The entire decrease was suffered by stores with annual *gross* sales of less than $50,000. During the same period, the number of stores in all higher sales brackets increased. The Commission noted that the census figures, from which its data were taken, included an undetermined number of grocery firms liquidating after 1948 that merely closed their grocery operations and continued their remaining lines of business, such as nongrocery retailing, food wholesaling, food manufacturing, etc. Staff Report to the Federal Trade Commission, Economic Inquiry Into Food Marketing, Part I, Concentration and Integration in Retailing 48, 54 (1960).

[12] The generalized case against the Court's numerical approach is stated in Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 312, n. 261:

"[T]here are serious problems connected with the use of this yardstick. First, not every firm contributes equally to competition. In particular, there may be a fringe of firms too small to be able to affect price and production policies in the market as a whole. Alternatively, certain firms may be marginal in the sense that their costs and financial situations preclude them from having much, if any, impact on market conditions; indeed they may be able to remain in operation only because excessive profits are being earned by the stronger firms. An [exit] of companies of this sort would have much less significance than a counting of corporate heads would imply."

themselves but also between chain stores and single-store operators. The continuing population explosion of the Los Angeles area, which has outrun the expansion plans of even the largest chains, offers a surfeit of business opportunity for stores of all sizes.[13] Affiliated with cooperatives that give the smallest store the buying strength of its largest competitor, new stores have taken full advantage of the remarkable ease of entry into the market. And, most important of all, the record simply cries out that the numerical decline in the number of single-store owners is the result of transcending social and technological changes that positively preclude the inference that competition has suffered because of the attrition of competitors.

Section 7 was never intended by Congress for use by the Court as a charter to roll back the supermarket revolution. Yet the Court's opinion is hardly more than a requiem for the so-called "Mom and Pop" grocery stores—the bakery and butcher shops, the vegetable and fish markets—that are now economically and technologically obsolete in many parts of the country. No action by this Court can resurrect the old single-line Los Angeles food stores that have been run over by the automobile or obliterated by the freeway. The transformation of American society since the Second World War has not completely shelved these specialty stores, but it has relegated them to a much less central role in our food economy. Today's dominant enterprise in food retailing is the supermarket. Accessible to the housewife's automobile from a wide radius, it houses under a single roof

---

[13] Between 1953 and 1961, the population of the Los Angeles metropolitan area increased from 4,300,000 to 6,800,000 and the average population per grocery store increased from 695 to 1,439. Additional opportunity for new stores in the area results from the geographical division of the city into numerous suburbs, as well as from the lack of specific store loyalty among new residents.

the entire food requirements of the family. Only through the sort of reactionary philosophy that this Court long ago rejected in the Due Process Clause area can the Court read into the legislative history of § 7 its attempt to make the automobile stand still, to mold the food economy of today into the market pattern of another era.[14]

---

[14] Cf. *Ferguson* v. *Skrupa*, 372 U. S. 726. In criticizing a recent decision of the Federal Trade Commission, one commentator has stated, in terms applicable *mutatis mutandis* to the Court's decision in the present case:

". . . Any child alive in the 1950's could see that a restructuring of food retailing was then going on. The business was adjusting itself, through market mechanisms that included merger, to vast and profound changes in the American way of life. There is not a word in the FTC majority opinion that relates changes in the number of stores and chains to the proliferation of suburbs, the construction of shopping centers, and the final triumph of the supermarket—an innovation in retailing that has since spread across the Western world. The most important single cause of these changes was the automobile revolution . . . which not even the FTC can stop.

   ·      ·      ·      ·      ·

". . . Plenty of living American men and women remember an era when virtually all groceries were sold through very small stores none of which had 'any significant market share.' Was this era the high point of competition in food retailing? Many little towns had, in fact, only one place where a given kind of food could be bought. In a typical city neighborhood, defined by the range of a housewife's willingness to lug groceries home on foot, there might be three or four relaxed 'competitors.' If she did not like the price or quality offered by them, she could take her black-string market bag, board a trolley car, and try her luck among the relaxed 'competitors' of some other neighborhood." Ways, A New "Worst" in Antitrust, Fortune, April 1966, pp. 111–112.

In the present case, the District Court found that in the era preceding the rise of the supermarkets, "the area from which the typical store drew most of its customers was limited to a block or two in any direction and if a particular grocery store happened to be the only one in its immediate neighborhood, it had a virtual monopoly of local trade." Thus, the Court's aphorism in *U. S.* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 363—that "[c]ompetition

This is not a case in which the record is equivocal with regard to the status of competition in the industry in question. To the contrary, the record offers abundant evidence of the dramatic history of growth and prosperity of the retail food business in Los Angeles.

The District Court's finding of fact that there was no increase in market concentration before or after the merger is amply supported by the evidence if concentration is gauged by any measure other than that of a census of the number of competing units. Between 1948 and 1958, the market share of Safeway, the leading grocery chain in Los Angeles, declined from 14% to 8%. The combined market shares of the top two chains declined from 21% to 14% over the same period; for the period 1952–1958, the combined shares of the three, four, and five largest firms also declined. It is true that between 1948 and 1958, the combined shares of the top 20 firms in the market increased from 44% to 57%. The crucial fact here, however, is that seven of these top 20 firms in 1958 were not even in existence as chains in 1948. Because of the substantial turnover in the membership of the top 20 firms, the increase in market share of the top 20 as a group is hardly a reliable indicator of any tendency toward market concentration.[15]

is likely to be greatest when there are many sellers, none of which has any significant market share"—is peculiarly maladroit in the historic context of the retail food industry. See also Hampe & Wittenberg, The Lifeline of America: Development of the Food Industry 313–372 (1964); Lebhar, Chain Stores in America 1859–1962, pp. 348–390 (1963).

[15] See Joskow, Structural Indicia: Rank-Shift Analysis as a Supplement to Concentration Ratios, VI Antitrust Bulletin 9 (1961). In addition, the overall market share of the top 20 firms in fact showed a slight decline between 1958 and 1960. The statement in the concurring opinion in the present case, that "All but two of the top 10 firms in 1958 were very probably also among the top 10 in 1948 or had acquired a firm that was among the top 10," is

In addition, statistics in the record for the period 1953–1962 strongly suggest that the retail grocery industry in Los Angeles is less concentrated today than it was a decade ago. During this period, the number of chain store firms in the area rose from 96 to 150, or 56%. That increase occurred overwhelmingly among chains of the very smallest size, those composed of two or three grocery stores. Between 1953 and 1962, the number of such "chains" increased from 56 to 104, or 86%. Although chains of 10 or more stores increased from 10 to 24 during the period, seven of these 24 chains were not even in existence as chains in Los Angeles in 1953.[16]

Yet even these dramatic statistics do not fully reveal the dynamism and vitality of competition in the retail grocery business in Los Angeles during the period. The record shows that at various times during the period 1953–1962, no less than 269 separate chains were doing business in Los Angeles, of which 208 were two- or three-store chains. During that period, therefore, 173 new chains made their appearance in the market area, and 119 chains went out of existence as chain stores.[17] The vast majority of this market turbulence represented turnover in chains of two or three stores; 143 of the 173 new chains born during the period were chains of this

based on conjecture. The record demonstrates only that the top four firms in 1948 were among the top 10 firms in 1958; the record neither identifies the remaining six of the top 10 firms in 1948 nor charts their subsequent history.

[16] For a similar study of the retail food industry at the national level, see Lebhar, Small Chain Virility a Bar to Monopoly, Chain Store Age, Jan. 1962, p. E20. See also Gould, The Relation of Sales Growth to the Size of Multi-Store Food Retailers 6 (1966) (inverse correlation found between sales growth and size of chains with four or more stores).

[17] Of these latter 119 chains, 66 went out of business altogether, 28 reduced their operations to a single store, and 25 were eliminated as separate competitors as a result of acquisitions by other chains.

size. Testimony in the record shows that, almost without exception, these new chains were the outgrowth of successful one-store operations.[18]   There is no indication that comparable turmoil did not equally permeate single-store operations in the area.[19]   In fashioning its *per se* rule, based on the net arithmetical decline in the number of single-store operators, the Court completely disregards the obvious procreative vigor of competition in the market as reflected in the turbulent history of entry and exit of competing small chains.

To support its conclusion the Court invokes three sets of data regarding absorption of smaller firms by merger with larger firms.   In each of the acquisitions detailed

[18] On the basis of these facts, one witness concluded:
"The apparent willingness and ability of grocers to expand and create new chain entities at the staggering rate of more than 17 a year, and the growth potential of new chains, precludes in my opinion the possibility that the retail grocery business in Los Angeles will become either monopolistic or oligopolistic in the foreseeable future. It must be remembered that in 1953, only 10 chains with as many as 10 stores each were operating in the area. These chains are recognized as being among the best managed, most successful and most aggressive supermarket operators in the country. They themselves have engaged in expansion programs of significant proportions since 1953. Yet, 10 years later, instead of having swept aside all competition and being left alone to compete among themselves, these same 10 chains are now faced with the necessity of competing against no less than 14 new chains of 10 or more stores each, a significantly greater number of smaller chains and a host of successful single store operators, of whom many are affiliated with powerful voluntary chains or other cooperative groups. . . . The growth of independents into chains and of small chains into larger ones . . . demonstrates convincingly that small concerns don't have to remain small in Los Angeles."

[19] Data for 1960, the only year for which such figures are available in the record, reveal a comparable agitation of entry and exit among operators of single stores. Although there was a net loss of 132 single-outlet stores in 1960, 128 new single-outlet stores opened during the year.

in the Appendix, Tables 1 and 2 of the Court's opinion, the acquired units were grocery *chains*. Not one of these acquisitions was of a firm operating only a single store.[20] The Court cannot have it both ways. It is only among single-store operators that the decline in the unit number of competitors, so heavily relied upon by the Court, has taken place. Yet the tables reproduced in the Appendix show not a trace of merger activity involving the acquisition of single-store operators. And the number of *chains* in the area has in fact shown a substantial net increase during the period, in spite of the fact that some of the chains have been absorbed by larger firms. How then can the Court rely on these acquisitions as evidence of a tendency toward market concentration in the area?

The Court's use of market-acquisition data for the period 1954–1961,[21] prepared by the Government from the work sheets of a defense witness, is also questionable for another reason. During that period, Food Giant, Alpha Beta, Fox, and Mayfair were ranked 7th, 8th, 9th, and 10th, respectively, on the basis of the percentage of their sales in Los Angeles in 1958, so that the impact of their acquisitions, made in the face of competition by the top six chains, is considerably blunted. The remarkable feature disclosed by these data is that none of the top six firms in the area expanded by acquisition during the period.[22]

---

[20] As to Table 1 in the Appendix of the Court's opinion, this fact is obvious on the face of the table. As to Table 2 in the Appendix, examination of the record discloses that each of the nine acquisitions listed as involving a single store represented purchases of single stores from chains ranging in size from two to 49 stores.

[21] See Table 1 in the Appendix of the Court's opinion.

[22] Table 1 in the Appendix of the Court's opinion is somewhat misleading in that it weights the data from which it is drawn in favor of the acquisition by grocery chains of other chains consisting of relatively larger numbers of store units. The complete data of the wit-

The Court's reliance on the fact that nine of the top 20 chains acquired 120 stores in the Los Angeles area between 1949 and 1958 does not withstand analysis in light of the complete record. Forty percent of these acquisitions, representing 48 stores with gross sales of more than $71,000,000, were made by Fox, Yor-Way, and McDaniels, which ranked 9th, 11th, and 20th, respectively, according to 1958 sales in the market. Each of these firms subsequently went into bankruptcy as a result of overexpansion, undercapitalization, or inadequate managerial experience. This substantial post-acquisition demise of relatively large chains hardly comports with the Court's tacit portrayal of the inexorable march of the market toward oligopoly.

Further, the table relied on by the Court to sustain its view that acquisitions have continued in the Los Angeles area at a rapid rate in the three-year period following this merger indiscriminately lumps together horizontal and market-extension mergers.[23] Only 29 stores, representing 13 acquisitions, were acquired in horizontal mergers, and the record reveals that nine of these 29 stores were acquired in the course of dispositions in bankruptcy. Such acquisitions of failing companies, of course, are immune from the Clayton Act. *International Shoe Co.* v. *Federal Trade Commission,* 280 U. S. 291, 301–303. Thus, at a time when the number of single-store concerns was well over 3,500, horizontal mergers over a three-year period between going concerns achieved at most only the *de minimis* level of 10 acquisitions involving 20 stores. It cannot seriously be maintained that

ness included several acquisitions of one- and two-store concerns, together with the disposition of one ten-store chain to various individuals.

[23] See Table 2 in the Appendix of the Court's opinion. This table, not a part of the record, was submitted by the Government in its reply brief, filed on the eve of oral argument.

the effect of the negligible market share foreclosed by these horizontal mergers may be substantially to lessen competition within the meaning of § 7. Cf. *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 329.

The great majority of the post-merger acquisitions detailed in Table 2 in the Appendix of the Court's opinion, *ante*, were of the market-extension type, involving neither the elimination of direct competitors in the Los Angeles market nor increased concentration of the market. There are substantial economic distinctions between such market-extension mergers and classical horizontal mergers.[24] Whatever the wisdom or logic of the Court's assumed arithmetic proportion between the number of single-store concerns and the level of competition within the meaning of § 7 as applied to horizontal mergers, it is simply not possible to make the further assumption that the mere occurrence of market-extension mergers is adequate to prove a tendency of the local market toward decreased competition.

Moreover, contrary to the assumption on which the Court proceeds, the record establishes that the present merger itself has substantial, even predominant, market-extension overtones. The District Court found that the Von's stores were located in the southern and western portions of the Los Angeles metropolitan area, and that the Shopping Bag stores were located in the northern and eastern portions. In each of the areas in which Von's and Shopping Bag stores competed directly, there were also at least six other chain stores and several

---

[24] See *Foremost Dairies, Inc.*, 60 F. T. C. 944; *Beatrice Foods Co.*, F. T. C. Docket No. 6653 (April 26, 1965); *National Tea Co.*, F. T. C. Docket No. 7453 (March 4, 1966). Cf. *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158; *Procter & Gamble Co.*, F. T. C. Docket No. 6901 (Nov. 26, 1963), rev'd 358 F. 2d 74 (C. A. 6th Cir.); Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv. L. Rev. 1313.

smaller stores competing for the patronage of customers. On the basis of a "housewife's 10-minute driving time" test conducted for the Justice Department by a government witness, it was shown that slightly more than half of the Von's and Shopping Bag stores were not in a position to compete at all with one another in the market.[25] Even among those stores which competed at least partially with one another, the overlap in sales represented only approximately 25% of the combined sales of the two chains in the overall Los Angeles area. The present merger was thus three parts market-extension and only one part horizontal, but the Court nowhere recognizes this market-extension aspect that exists within the local market itself. The actual market share foreclosed by the elimination of Shopping Bag as an independent competitor was thus slightly less than 1% of the total grocery store sales in the area. The share of the market preempted by the present merger was therefore practically identical with the 0.77% market foreclosure accepted as "quite insubstantial" by the Court in *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320, 331–333.

The irony of this case is that the Court invokes its sweeping new construction of § 7 to the detriment of a merger between two relatively successful, local, largely family-owned concerns, each of which had less than 5% of the local market and neither of which had any prior history of growth by acquisition.[26] In a sense, the de-

---

[25] Evidence introduced by the defendants indicated that the overlap between the Von's and Shopping Bag stores was significantly smaller than that proposed by the government witness.

[26] At the time of the merger in 1960, Von's operated 28 retail grocery stores in the Los Angeles area. It commenced operation as a partnership of the Von der Ahe family in 1932, during the depression, with a food concession in a small grocery store. Shopping Bag operated 36 stores in Los Angeles at the time of the merger; it commenced operation as a partnership in a small grocery store

fendants are being punished for the sin of aggressive competition.[27] The Court is inaccurate in its suggestions, *ante*, pp. 277–278, that the merger makes these firms more "powerful" than they were before, and that Shopping Bag was itself a "powerful" competitor at the time of the merger. There is simply no evidence in the record, and the Court makes no attempt to demonstrate, that the increment in market *share* obtained by the combined stores can be equated with an increase in the market *power* of the combined firm. And, although Shopping Bag was not a "failing company" within the meaning of our decision in *International Shoe Co.* v. *Federal Trade Commission*, 280 U. S. 291, 301–303, the record at

in 1930. So far as the record reveals, the competitive behavior of these firms was impeccable throughout their expansion, which took place solely by internal growth. In discussing the success of comparable firms *vis-à-vis* the Sherman Act, Judge Learned Hand stated, "[T]he Act does not mean to condemn the resultant of those very forces which it is its prime object to foster: finis opus coronat. The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States* v. *Aluminum Co. of America*, 148 F. 2d 416, 430.

[27] Nor is it altogether easy to escape the feeling that it is not so much this merger, but Los Angeles itself, that is being invalidated here. Cf. Adelman, Antitrust Problems: The Antimerger Act, 1950–60, 51 Am. Econ. Rev. 236, 243 (May 1961): "In the antitrust dictionary, 'powerful' has no necessary connection with monopoly power or market control or even market share. It means . . . one four-letter word: size." Los Angeles is, to be sure, a big place. Although Shopping Bag's share of the Los Angeles market was only 4.2%, its sales in 1958 totaled $84,000,000. Compare the Court's statement in *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U. S. 320, 333–334:

"It is urged that the present contract pre-empts competition to the extent of purchases worth perhaps $128,000,000, and that this 'is, of course, not insignificant or insubstantial.' While $128,000,000 is a considerable sum of money, even in these days, the dollar volume, by itself, is not the test . . . ."

least casts strong doubt on the contention that it was a powerful competitor.[28] The District Court found that Shopping Bag suffered from a lack of qualified executive personnel [29] and that, although overall sales of the chain had been increasing, its earnings and profits were declining.[30] Further, the merger clearly comported with "the desirability of retaining 'local control' over industry" that the Court noted in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 315–316.

With regard to the "plight" of the small businessman, the record is unequivocal that his competitive position is strong and secure in the Los Angeles retail grocery industry. The most aggressive competitors against the larger retail chains are frequently the operators of single stores.[31] The vitality of these independents is directly

---

[28] This is not a "merger between two small companies to enable the combination to compete more effectively with larger corporations dominating the relevant market," *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 319; cf. House Hearing, *supra,* n. 5, pp. 40–41; Senate Hearings, *supra,* n. 10, pp. 6, 51; 95 Cong. Rec. 11486, 11488, 11506; 96 Cong. Rec. 16436; H. R. Rep. No. 1191, 81st Cong., 1st Sess., pp. 6–8; S. Rep. No. 1775, 81st Cong., 2d Sess., p. 4. However, the Court today in a gratuitous dictum, *ante,* p. 277, undercuts even that principle by confining it to cases in which competitors are obliged to merge to save themselves from *destruction* by a larger and more powerful competitor.

[29] Mr. Hayden, the president and principal stockholder of Shopping Bag, was advanced in years and was concerned over the absence of a strong management staff that could take over his responsibilities.

[30] Von's was a considerably more successful competitor than Shopping Bag. Shopping Bag's net income as a percentage of total sales declined from 1.6% in 1957 to 0.9% in 1959, and its net profit as a percentage of total assets declined from 6.6% to 3.2%. During the same period, the net income of Von's increased from 2.1% to 2.3%, and its net profits declined from 12.7% to 10.8%.

[31] One single-store operator, located adjacent to one supermarket and within a mile of two others, testified, "I have often been asked if I could compete successfully against this sort of competition. My

attributable to the recent and spectacular growth in California of three large cooperative buying organizations. Membership in these groups is unrestricted; through them, single-store operators are able to purchase their goods at prices competitive with those offered by suppliers even to the largest chains.[32] The rise of these cooperative organizations has introduced a significant new source of countervailing power against the market power of the chain stores, without in any way sacrificing the advantages of independent operation. In the face of

---

answer is and always has been that the question is not whether I can compete against them, but whether they can compete against me."

Another single-store operator testified, "Competition in the grocery business is on a store-by-store basis and any aggressive and able operator like myself can out-compete the store of any of the chains because of personalized service, better labor relations, and being in personal charge of the store and seeing that it is run properly."

A third single-store operator testified, "The chains in this area are good operators, but when they grow too large, they are actually easier to compete with from an independent's viewpoint. If I had a choice, I would rather operate a store near a chain unit than near another independent."

[32] See generally Staff Report to the Federal Trade Commission, Economic Inquiry Into Food Marketing, Part I, Concentration and Integration in Retailing, c. VI, "Retailer-owned Cooperative Food Wholesalers"; c. VII, "Wholesaler-sponsored Voluntary Retail Groups" (1960). The annual sales of Certified Grocers of California, Ltd., a retailer-owned cooperative whose members do business principally in the Los Angeles area, rose fourfold from $87,000,000 in 1948 to $345,000,000 in 1962, and the volume of its purchases exceeded that of all but the largest national chains doing business in Los Angeles. Most of the leading chains in the area began development in association with Certified Grocers, called the "mother" of the industry. In some cases the cooperatives were able to offer even lower prices to their members than competing chains could obtain. The District Court found that the cooperatives also provided their members with assistance in merchandising, advertising, promotions, inventory control, and even the financing of new entry.

the substantial assistance available to independents through membership in such cooperatives, the Court's implicit equation between the market power and the market share resulting from the present merger seems completely invalid.

Moreover, it is clear that there are no substantial barriers to market entry. The record contains references to numerous highly successful instances of entry with modest initial investments. Many of the stores opened by new entrants were obtained through the disposition of unwanted outlets by chains; frequently the new competitors were themselves chain-store executives who had resigned to enter the market on their own. Enhancing free access to the market is the absence of any such restrictive factors as patented technology, trade secrets, or substantial product differentiation.

Numerous other factors attest to the pugnacious level of grocery competition in Los Angeles, all of them silently ignored by the Court in its emphasis solely on the declining number of single-store competitors in the market. Three thousand five hundred and ninety single-store firms is a lot of grocery stores. The large number of separate competitors and the frequent price battles between them belie any suggestion that price competition in the area is even remotely threatened by a descent to the sort of consciously interdependent pricing that is characteristic of a market turning the corner toward oligopoly. The birth of dynamic new competitive forces—discount food houses and food departments in department stores, bantams and superettes, deli-liquor stores and drive-in dairies—promises unremitting competition in the future. In the more than four years following the merger, the District Court found not a shred of evidence that competition had been in any way impaired by the merger. Industry witnesses testified over-

whelmingly to the same effect. By any realistic criterion, retail food competition in Los Angeles is today more intense than ever.

The harsh standard now applied by the Court to horizontal mergers may prejudice irrevocably the already difficult choice faced by numerous successful small and medium-sized businessmen in the myriad smaller markets where the effect of today's decision will be felt, whether to expand by buying or by building additional facilities.[33] And by foreclosing future sale as one attractive avenue of eventual market exit, the Court's decision may over the long run deter new market entry and tend to stifle the very competition it seeks to foster.

In a single sentence and an omnibus footnote at the close of its opinion, the Court pronounces its work consistent with the line of our decisions under § 7 since the passage of the 1950 amendment. The sole consistency that I can find is that in litigation under § 7, the Government always wins. The only precedent that is even within sight of today's holding is *U. S.* v. *Philadelphia Nat. Bank,* 374 U. S. 321. In that case, in the interest of practical judicial administration, the Court proposed a simplified test of merger illegality: "[W]e think that a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *U. S.* v. *Philadelphia Nat. Bank, supra,* at 363.[34] The merger

---

[33] See Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 302–303 (1960).

[34] In a footnote, the Court emphasized the corollary principle that, "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the

between Von's and Shopping Bag produced a firm with 1.4% of the grocery stores and 7.5% of grocery sales in Los Angeles, and resulted in an increase of 1.1% in the market share enjoyed by the two largest firms in the market and 3.3% in the market share of the six largest firms. The former two figures are hardly the "undue percentage" of the market, nor are the latter two figures the "significant increase" in concentration, that would make this merger inherently suspect under the standard of *Philadelphia Nat. Bank*. Instead, the circumstances of the present merger fall far outside the simplified test established by that case for precisely the sort of merger here involved.[35]

---

possibility of eventual deconcentration is correspondingly great." *U. S.* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 365, n. 42. That corollary, of course, has no application here, since the Los Angeles retail grocery market can in no sense be characterized as one in which "concentration is already great." Compare *United States* v. *Aluminum Co. of America*, 377 U. S. 271; *United States* v. *Continental Can Co.*, 378 U. S. 441. The importance of a trend toward concentration in the particular industry in question was recognized in *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 332. See also *Pillsbury Mills, Inc.*, 50 F. T. C. 555, 572–573; *United States* v. *Bethlehem Steel Corp.*, 168 F. Supp. 576, 604–607 (D. C. S. D. N. Y.); U. S. Atty. Gen. Nat. Comm. to Study the Antitrust Laws, Report 124 (1955).

[35] As a result of the merger, the market share of the two largest firms increased from 14.4% to 15.5%, and the share of the six largest firms increased from 32.1% to 35.4%. The merger involved in *Philadelphia Nat. Bank* produced a single firm controlling 30% of the market, and resulted in an increase from 44% to 59% in the market share of the two largest firms in the market. The Court's opinion is remarkable for its failure to support its conclusion by reference to even a single piece of economic theory. I shall not dwell here on the barometers of competition that have been suggested by the commentators. But it seems important to note that the present merger falls either outside, or at the very fringe, of the various mechanical tests that have been proposed. See, *e. g.*, Kaysen &

The tests of illegality under § 7 were "intended to be similar to those which the courts have applied in interpreting the same language as used in other sections of the Clayton Act." H. R. Rep. No. 1191, 81st Cong., 1st Sess., p. 8. In *Philadelphia Nat. Bank,* the Court was at pains to demonstrate that its conclusion was consistent with cases under § 3 of the Clayton Act. See *U. S.* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 365–366. The Court disdains any such effort today. Untroubled by the language of § 7, its legislative history, and the cases construing either that section or any other provision of the antitrust laws, the Court grounds its conclusion solely on the impressionistic assertion that the Los Angeles retail food industry is becoming "concentrated" because the number of single-store concerns has declined.

---

Turner, Antitrust Policy 133–136 (1959) (horizontal merger with direct competitor is prima facie unlawful where acquiring company accounts for 20% or more of the market, or where merging companies together constitute 20% or more of the market; acquisitions producing less than 20% market control unlawful only where special circumstances are present, such as serious barriers to entry or substantial influence on prices by the acquired company); Stigler, Mergers and Preventive Antitrust Policy, 104 U. Pa. L. Rev. 176, 179–182 (1955) (acquisition unlawful if it produces a combined market share of 20% or more; acquisition permitted if the combined share is less than 5–10%); Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 308–329 (1960) (no merger by the dominant firm in an industry if its market share is increased by more than 2–3%; no merger by other large firms in the industry where the combined market shares of the two-to-eight largest firms after the merger are increased by 7–8% or more over the shares that existed at any time during the preceding 5–10 years; no merger where acquired firm has 5% market share or more). See also Markham, Merger Policy Under the New Section 7: A Six-Year Appraisal, 43 Va. L. Rev. 489, 521–522 (1957). The 40% rule promoted by the concurring opinion in the present case seems no more than an *ad hoc* endeavor to rationalize the holding of the Court.

The emotional impact of a merger between the third and sixth largest competitors in a given market, however fragmented, is understandable, but that impact cannot substitute for the analysis of the effect of the merger on competition that Congress required by the 1950 amendment. Nothing in the present record indicates that there is more than an ephemeral possibility that the effect of this merger may be substantially to lessen competition. Section 7 clearly takes "reasonable probability" as its standard. That standard has not been met here, and I would therefore affirm the judgment of the District Court.