**BOYERTOWN BURIAL CASKET COMPANY**

v.

**WALCO NATIONAL CORPORATION.**

**Civ. A. No. 72–875.**

United States District Court,
E. D. Pennsylvania.

June 21, 1972.

---

3. Rule 31(c) says, "The defendant may be found guilty of an offense necessarily included in the offense charged. . . . "

Robert S. Ryan, Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiff.

Joseph W. Swain, Jr., Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendant.

OPINION AND ORDER

JOSEPH S. LORD, III, Chief Judge.

Boyertown Burial Casket Company ("Boyertown") filed this action to en-

join Walco National Corporation ("Walco") from acquiring control of Boyertown on the ground that such an acquisition would violate § 7 of the Clayton Act, 15 U.S.C.A. § 18. Boyertown is a Pennsylvania corporation engaged in the manufacture and sale of caskets with its principal place of business at Boyertown, Pa. Walco is a New York corporation also engaged in the manufacture and sale of caskets through its National Casket Company Division. Walco has its principal place of business at 743 Fifth Avenue, New York, N. Y. and maintains an office in Philadelphia, Pa. We have jurisdiction under 15 U.S.C.A. §§ 15 and 26. Venue is proper in this district, 15 U.S.C.A. § 22.

In its complaint, Boyertown alleges that Walco has taken steps to effect an immediate acquisition of Boyertown through a cash tender offer to Boyertown's shareholders. Boyertown alleges that an acquisition of Boyertown by Walco would substantially lessen competition and tend to create a monopoly in the market for caskets in violation of § 7 of the Clayton Act. Boyertown further alleges that Walco's actions to date have disrupted and threatened to disrupt its relationships with its customers and employees and that further action by Walco to effect the acquisition will result in irreparable injury to Boyertown. Boyertown seeks a preliminary injunction restraining Walco from taking any action to acquire Boyertown.

On May 3, 1972, we entered a temporary restraining order which enjoined Walco from "acquiring or seeking to acquire shares or assets of Boyertown; soliciting, contacting or communicating with shareholders or directors of Boyertown for the purpose of seeking representation on its Board of Directors or seeking proxies; soliciting, contacting or communicating with customers or employees of Boyertown for the purpose of promoting or effecting any such tender offer, merger or acquisition." On May 11, 1972, we continued this order pending final decision on the application for preliminary injunction. An evidentiary hearing on plaintiff's motion for a preliminary injunction was held on May 8–9, 11–12, 1972.

Section 16 of the Clayton Act, 15 U.S.C.A. § 26, empowers a federal court to grant injunctive relief in a private action

"\* \* \* against threatened loss or damage by a violation of the antitrust laws, \* \* \* when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, \* \* \* and upon the execution of a proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, \* \* \*."

In a suit seeking a preliminary injunction against a threatened violation of § 7 of the Clayton Act, this Circuit explained the criteria to be applied by a district court in ruling on a motion for preliminary relief as follows:

"Recognizing that preliminary relief is a serious remedy, and because application for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the courts have required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted."

Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506, 510–511 (C.A. 3, 1969).

Therefore, we must determine (1) whether plaintiff has established a reasonable probability that it will prevail at final trial on the charge of a § 7 violation; and (2) whether plaintiff has established that it will suffer irreparable harm if an injunction pendente lite is not granted.

## SECTION 7 VIOLATION

Section 7 of the Clayton Act prohibits a corporation engaged in commerce from acquiring "directly or indirectly, the whole or any part of the stock * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C.A. § 18.

### The Industry

There is no dispute that the manufacture and sale of burial caskets constitute the relevant line of commerce in this case. The various types of caskets include cloth-covered, hardwood, steel, copper and bronze. Three types of firms manufacture caskets. Some perform all fabrication and manufacturing steps and sell completed units to funeral directors. Some fabricate shells or parts and sell them to the third type of firm which consists of manufacturers or jobbers who complete the units and sell them to funeral directors. Casket manufacturers are further differentiated in terms of the product line they handle and the size of the geographic area in which they distribute their product. Some manufacturers produce a full line of caskets (cloth-covered, wood and metal), while others concentrate on one or more types. Approximately 250 manufacturers distribute on a state or regional basis while many have only local distribution. A relatively few distribute their products over large areas or nationwide. Walco and Boyertown are the only full line manufacturers who distribute their products on a nationwide basis.

The size of the potential market for caskets is established by mortality. In 1970, there were approximately 1,930,000 deaths in the continental United States. In 1971, casket sales to funeral directors totaled approximately $325,000,000 per year.

The largest manufacturer of caskets in the United States is Batesville Casket Company ("Batesville"), Batesville, Indiana, a subsidiary of Hillenbrand Industries, Inc. Batesville manufactures only metal caskets and distributes them through warehouse locations across the country. Batesville's sales are approximately $35,000,000 or 11% of the national total.

Walco is the second largest manufacturer of caskets. Walco produces a full line of cloth-covered, wood and metal caskets which it distributes through 43 branches located in the northeast, midwest, south and southwest and through sales representatives in the Rocky Mountain and West Coast areas. Walco's branch offices consist of a warehouse for casket storage and generally include selection rooms in which caskets are displayed and to which local funeral directors bring their customers to select caskets. Since May, 1971, Walco has acquired five casket companies, and Walco's sales of caskets, including those of its acquisitions, total $22,800,000 or 7% of the national total.

Boyertown is the third largest manufacturer of caskets with sales of $15,800,000 or 5% of the national total. Boyertown produces a full line of caskets which it distributes through 23 branches located in the northeast, midwest and California. These branches are also composed of warehouses and selection rooms, and most of Boyertown's branches are located in the same metropolitan areas in which Walco has branch offices.

The fourth largest manufacturer is Simmons Company which has acquired Elgin Associates and York-Hoover. Elgin manufactures metal casket shells which it distributes through a jobber organization known as Elgin Associates. York-Hoover manufactures hardwood and metal caskets. Sales of Elgin Associates could not be estimated although the testimony indicates that the figure would exceed $8,000,000. York-Hoover has sales of approximately $6,000,000. A conservative estimate would place the sales of Simmons Company between $14,000,000 and $15,000,000 or 4% of the national total.

Although there are approximately 600 casket manufacturers in the United States, a small number of firms occupy a commanding position in the industry. The four largest manufacturers control 27% of the total sales of burial caskets in the nation. The next eight firms have sales of approximately $41,000,000 so that the top twelve firms in the industry (approximately·2% of the manufacturers) account for 40% of the total sales.

### Relevant Geographical Market

Section 7 prohibits acquisitions which may substantially lessen competition in any line of commerce in any section of the country. Walco argues that the proper "section of the country" in which to measure the effect of an acquisition by Walco of the stock of Boyertown is the nation as a whole and the following three regional sub-markets: the Northeast and Central area, the South and Southwest area and the West and Rocky Mountain area. Boyertown contends that in addition to the national market, there are five metropolitan areas which should be regarded as sections of the country under § 7. They consist of the standard metropolitan statistical areas ("SMSA") of Albany, Schenectady, Troy, New York; New York, New York; Buffalo, New York; Cleveland, Ohio; and the composite area of Newark, Jersey City, Patterson, Clifton, and Passaic, New Jersey.

In United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), the Supreme Court set forth the following standard for determining the appropriate "section of the country" under § 7.

> " * * * The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. * * * This depends upon 'the geographic structure of supplier-customer relations.' "

United States v. PNB, *supra*, 374 U.S. at 357, 83 S.Ct. at 1738.

In United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L. Ed.2d 765 (1966), the Supreme Court rejected the argument that the "section of the country" need be proved with exactness. In Pabst, the United States charged that the acquisition by Pabst, the country's tenth largest brewer, of Blatz Brewing Company, the eighteenth largest brewer, violated § 7 of the Clayton Act by substantially lessening competition in the sale of beer in the United States, in Wisconsin, and in the three-state area of Wisconsin, Michigan and Illinois. The District Court dismissed that complaint on the ground, *inter alia*, that the government failed to prove that either Wisconsin or the three-state area constituted a relevant section of the country within the meaning of § 7. The Supreme Court reversed, holding that all three areas were relevant sections of the country and finding that the merger violated § 7 in "each and all of these three areas."

> " * * * Apparently the District Court thought that in order to show a violation of § 7 it was essential for the Government to show a 'relevant geographic market' in the same way the corpus delicti must be proved to establish a crime. But when the Government brings an action under § 7 it must, according to the language of the statute, prove no more than that there has been a merger between two corporations engaged in commerce and that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in any line of commerce *'in any section of the country.'* (Emphasis supplied.) The language of this section requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States—'in *any* section' of the United States. This phrase does not call for the delineation of a 'section of the country' by metes and bounds as a surveyor would lay off a plot of

ground. The Government may introduce evidence which shows that as a result of a merger competition may be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of § 7 would be proved. Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a § 7 case. * * * Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States."

Pabst, supra, 384 U.S. at 549–550, 86 S.Ct. at 1667.

■ Applying the considerations set forth in PNB and Pabst, we have concluded that the five metropolitan areas cited by the plaintiff are relevant sections of the country within the meaning of § 7 in this case. Casket sales are closely tied to population, and population itself is centered in urban areas. The business of the funeral director is local in scope, and the major manufacturers of caskets conform to these economic realities by locating their distribution points within urban areas where mortality figures are highest. Funeral directors often require immediate delivery of units, and casket makers who have locations within a metropolitan market are best able to supply this demand and,

therefore, have a competitive advantage over those who try to compete from the outside. The five areas cited are heavily populated urban centers in which both Boyertown and Walco maintain branch offices and in which both companies conduct a substantial portion of their total sales.[1]

*Effect on Competition*

The purpose of § 7 is "to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." United States v. Von's Grocery Co., 384 U.S. 270, 277, 86 S.Ct. 1478, 1482, 16 L.Ed.2d 555 (1966). In order to foster the Congressional purpose of arresting anticompetitive tendencies in their incipiency, the Court has concluded that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." United States v. PNB, *supra*, 374 U.S. at 363, 83 S.Ct. at 1741.

The acquisition of Boyertown by Walco would make Walco the largest casket manufacturer in the nation with 12% of total sales. Presently the two largest manufacturers control approximately 18% of the nation's casket sales. The two largest firms after the acquisition would control 23%. This represents an increase of 28% in concentration in the industry. In Pabst, the Court held that § 7 was violated by the merger of the nation's tenth and eighteenth largest brewers which left the surviving corporation with 4.49% of the industry's total sales.

---

1. In these five metropolitan areas, Boyertown conducts 31% of its total sales and Walco conducts 25% of its total sales.

Approximately 11% of the total sales of caskets in the United States are made in these five metropolitan areas.

In the five metropolitan markets, Walco and Boyertown presently have the following shares of area sales:

|  | Boyertown | Walco |
| --- | --- | --- |
| Albany, Schenectady, Troy | 29% | 36% |
| New York | 12% | 11% |
| Buffalo | 11% | 32% |
| Cleveland | 13% | 25% |
| Newark, etc. | 18% | 8% |

Walco's acquisition of Boyertown would leave Walco with 65% of the sales in the Albany, Schenectady, Troy SMSA; 23% of the sales in the New York SMSA; 43% of the sales in the Buffalo SMSA; 38% of the sales in the Cleveland SMSA; and 26% of the sales in the composite Newark, Jersey City and Patterson, Clifton, Passaic SMSAs. In Von's Grocery, the Court held that § 7 was violated by a merger of the third and sixth largest competitors in the retail grocery business in Los Angeles which left the surviving corporation with 7.5% of the metropolitan market. In United States v. PNB, the Court stated that a merger which resulted in one company having 30% of the relevant market inherently threatened undue concentration in the industry and would be held to violate § 7 in the absence of evidence clearly showing that the merger is not likely to have anticompetitive effects. 374 U.S. at 363–364, 83 S.Ct. 1715.

We recognize that Pabst and Von's Grocery were decided in the context of evidence of a steady trend toward economic concentration in the industry represented by the decline in the number of competitors and not on the basis of market shares alone. Although the evidence presented in this case to date does not establish as pronounced a trend towards concentration as in Pabst or Von's Grocery, it does suggest that the number of competitors is declining. In the period from 1959 to 1970, the total number of casket makers declined from 571 to 534.

The fourth and seventh largest firms have been acquired by Simmons Company, and Walco itself has acquired eight casket companies since 1965. Several major manufacturers have left the industry or curtailed their activities in the past few years.

It is clear from the nature of the industry that the acquisition or disappearance of a firm that fabricates and manufactures casket shells or completed units has a greater effect on competition and concentration in the industry than does the decline in the number of jobbers who complete the shells and sell them to funeral directors. An individual can enter the casket manufacturing business as a jobber with as little as $1,000, a family station wagon and a garage. However, fabrication of shells or parts involves a substantial capital investment in equipment so that the loss of a casket or shell fabricator cannot be easily filled. Therefore, the fact that the total number of casket manufacturers (which includes jobbers) has not declined substantially in the past decade does not establish that the industry is free from any trend toward economic concentration. The evidence we have before us does establish that despite the large number of casket makers, industry sales are heavily concentrated in a small number of large manufacturers and the recent decline in the number of firms has been primarily among the larger fabricators.

Section 7 is intended to arrest the trend towards concentration in its incipiency and therefore a plaintiff need not establish that an industry has become heavily concentrated before § 7 can be applied. On the basis of the evidence concerning market shares and concentration in the casket industry which presently exists and which would result from Walco's acquisition of Boyertown, we conclude that plaintiff has established a reasonable probability that it will ultimately prevail on the merits at trial that the acquisition of Boyertown by Walco would violate § 7 of the Clayton Act.

IRREPARABLE INJURY

Section 16 of the Clayton Act requires that a party seeking a preliminary injunction establish that "the danger of irreparable loss or damage is immediate." 15 U.S.C.A. § 26. We conclude that although Walco has evidenced an intention of making a tender offer to Boyertown stockholders, plaintiff has failed to establish that Walco intends to make such an offer immediately so as to warrant the issuance of a preliminary injunction.

Walco has made several overtures to Boyertown in the past few years concerning a combination of the two firms. In 1969, Mr. Richmond, the President of Walco, approached Mr. Mory, the President of Boyertown, and told Mr. Mory that he was anxious to merge Boyertown and Walco, but he failed to elicit any interest from Mr. Mory. In late 1971 or early 1972, Mr. Ponce, a director of and financial consultant to Walco, approached Mr. Thomas, a director of and counsel for Boyertown, with the suggestion that the two companies be combined. The Boyertown Board of Directors considered the suggestion on January 19, 1972 and instructed Mr. Thomas to advise Mr. Ponce that there was no interest on the part of the Board at that time.

Another inquiry by Mr. Ponce regarding a possible merger was reported to the Boyertown Board on March 15, 1972. The Board adopted a resolution that Mr. Mory inform Mr. Ponce that Boyertown had no interest in pursuing the matter. On April 20, 1972, Mr. Thomas met with Mr. Ponce and advised him that the Boyertown Board had again considered the matter and that there was still no interest in a joinder of the two companies.

On May 2, 1972, Mr. Headly, counsel for Walco, met with Mr. Thomas and stated that Walco intended to make a cash tender offer to Boyertown stockholders. He indicated that Walco had acquired 3,000 shares of Boyertown stock [2] and that it would like to have a list of the Boyertown stockholders without the delay involved in complying with the provisions of the Pennsylvania Business Corporation Law, 15 Pa.Stat.Ann. § 1308. This section requires that a shareholder who wishes to obtain a shareholder list submit a written demand under oath and wait five days for the company's reply. Boyertown insisted on compliance with the formal demand provision of the Pennsylvania law.

On May 3, 1972, the Boyertown Board met and authorized this lawsuit. On May 4, 1972, Walco sent a messenger from New York to Boyertown to present 1,989 shares of Boyertown stock for transfer into its name.

Walco's Board of Directors has not authorized or considered whether it will authorize the making of a tender offer to the shareholders of Boyertown. Walco has not formally requested a stockholder list from Boyertown, and no tender offer or filing with the Securities and Exchange Commission as required by 15 U.S.C.A. § 78n(d) (1) with respect to a tender offer has been made.

We recognize that under the terms of the temporary restraining order currently in force Walco is enjoined from making a tender offer; however, we do not find that plaintiff has established that Walco will make a tender offer immediately upon the expiration of the temporary restraining order, or before a final hearing in this matter can be held. Furthermore, we believe that our discussion of the probable illegality of Walco's acquisition of Boyertown will cause Walco to reassess and likely abandon its position with respect to the acquisition, and will dispel possible injury to Boyertown as a result of rumors concerning an impending acquisition. If Walco nevertheless proceeds to make a cash tender offer to Boyertown's stockholders, Boyertown may renew its motion

2. Boyertown has 250,000 shares of stock outstanding.

for a preliminary injunction as we retain jurisdiction of this matter.

The foregoing shall constitute our findings of fact and conclusions of law as required by F.R.Civ.P. 52.