**BOYERTOWN BURIAL CASKET COMPANY**

v.

**AMEDCO, INC.**

**Civ. A. No. 75–3688.**

United States District Court, E. D. Pennsylvania.

Jan. 31, 1976.

812

/

Robert S. Ryan, Stewart Dalzell, Philadelphia, Pa., for plaintiff.

Denis V. Brenan, Philadelphia, Pa., John J. Hennelly, Don G. Lents, St. Louis, Mo., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

### INTRODUCTION

This matter comes before the Court on the motion of Boyertown Burial Casket Company for a preliminary injunction to restrain a tender offer to Boyertown shareholders made by the defendant, Amedco, Inc., on December 22, 1975. Boyertown alleges that defendant's tender offer, by reason of material misstatements and omissions, violates the Williams Act, 15 U.S.C. §§ 78m(d–e) and 78n(d–f), and that the proposed acquisition violates § 7 of the Clayton Act, 15 U.S.C. § 18. During the hearing on the preliminary injunction, plaintiff moved for a temporary restraining order, alleging that a letter dated January 6, 1976, sent by defendant to plaintiff's shareholders, contained additional material misstatements and likewise omitted relevant information. After three days of hearing the Court entered an order temporarily restraining defendant from undertaking any further acts to promote or effectuate the offer, while reserving to defendant the right to extend the expiration date of the offer pending final adjudication.

### The Complaint

Plaintiff's complaint alleges two separate counts by which it seeks to restrain the tender offer. In Count I, Boyertown alleges that defendant's "offer to purchase outstanding shares of common stock" of plaintiff may result, if successful, in a violation of § 7 of the Clayton Act, 15 U.S.C. § 18, since the effect of Amedco's control of plaintiff would be to substantially lessen competition, or tend to create a monopoly in the burial casket industry in which there is a nationwide trend toward economic concentration. Plaintiff also avers the lack of an adequate remedy at law and irreparable injury due, inter alia, to the adverse effect of the tender offer on the morale and performance of Boyertown's management and employees, the disruption of normal business operations, the drain on management's time in resisting the illegal offer, the impairment of Boyertown's competitive ability, and finally, the irreversible damage incident to the ultimate disclosure of trade secrets to defendant's representatives ultimately placed on the plaintiff's Board of Directors.

In Count II, plaintiff alleges that the tender offer violates §§ 10(b) and 14(e) of the Securities Act of 1934 in that it is false and misleading, makes untrue statements of material fact and omits to state material facts necessary in order to make the statements made, in context, not misleading. Specifically, plaintiff alleges that the tender offer failed to accurately describe the proceedings in previous antitrust litigation brought under § 7 of the Clayton Act, *Boyertown Burial Casket Company v. Walco National Corp.*, 344 F.Supp. 1357 (E.D.Pa.) misstates the possibility of antitrust litigation, omits to state the merger rights of dissenting shareholders to the "fair value of their shares", fails to state the "quick value" of plaintiff's shares, and fails to describe accurately the controlling "persons" of Amedco. Thus, in this motion for preliminary injunctive relief, we are faced with a tender offer challenged under the applicable provisions of the antitrust and securities laws.

### The Clayton Act

The Clayton Act, § 7, 15 U.S.C. § 18, prohibits a corporation engaged in commerce from acquiring:

"* * * directly or indirectly, the whole or any part of the stock * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.

Prior to granting preliminary relief enjoining a threatened violation of § 7 of the Clayton Act, we are required in this Circuit to apply the following criteria as stated in *Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc.*, 414

F.2d 506, 510, 511 (3d Cir. 1969), *cert. denied* 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970).

> "Recognizing that preliminary relief is a serious remedy, and because application for such relief, particularly in a complex case, is often based on a record less comprehensive than that which a full adjudication would yield, the courts have required that a plaintiff show a reasonable chance of ultimately prevailing on the merits. In an action by a private party, the plaintiff must also show that it will suffer irreparable injury unless relief is granted."

*See also Boyertown Burial Casket Co. v. Walco National Corp.,* 344 F.Supp. 1357, 1359–1360 (E.D.Pa.1972).

A plaintiff need not prove that an industry has become heavily concentrated in order to show an antitrust violation since § 7 is intended to check the trend toward concentration in its incipiency. *United States v. Von's Grocery Co.,* 384 U.S. 270, 277, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966). Accordingly, in a preliminary hearing, plaintiff need only show a reasonable probability of ultimately proving that the effect of a merger between two corporations engaged in *any* relevant line of commerce in *any* section of the country *may* be to substantially lessen competition or tend to create a monopoly. On the basis of the evidence adduced at the preliminary hearing, we conclude that plaintiff met this burden.

As to the relevant line of commerce, sufficient evidence was introduced to show that the relevant industry is the manufacture and sale of burial caskets. This industry includes firms which manufacture completed caskets for sale to funeral directors, companies which produce incomplete shells or casket parts, and jobbers or finishers who add hardware, interiors and finish to incomplete units and sell the completed caskets to funeral directors.

As to the relevant geographical market, the following standard was set in *United States v. Philadelphia National Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963):

> " * * * The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. * * * This depends upon 'the geographical structure of supplier-customer relations'."

The nation as a whole, a regional area consisting of several states, or a more localized area may comprise the relevant geographical market for the purposes of § 7. Moreover, as stated in *United States v. Pabst Brewing Co.,* 384 U.S. 546, 549–550, 86 S.Ct. 1665, 1668, 16 L.Ed.2d 765:

> "Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States."

Plaintiff adduced sufficient evidence of two relevant geographic markets—areas of competitive overlap between Amedco and Boyertown—the nation as a whole and the Los Angeles-Long Beach Standard Metropolitan Statistical Area.

Finally, the plaintiff was not required to prove with mathematical precision that the effect of the acquisition *will* be to substantially lessen competition; rather, Boyertown's burden was to show with reasonable probability of ultimate success on the merits that the effect of the takeover *may* be to substantially lessen competition in the relevant sections of the country. As stated in *United States v. Von's Grocery, supra*:

> "By using these terms in § 7 which look not merely to the actual present effect of a merger but instead to its effect upon future competition, Congress sought to preserve competition among many small businesses by ar-

resting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever-increasing concentration through mergers." (Footnote omitted) 384 U.S. at 277, 86 S.Ct. at 1482.

■ The evidence showed a marked trend toward concentration in the burial casket industry, a trend which has accelerated since 1972 when Chief Judge Lord enjoined permanently a threatened takeover of plaintiff by Walco National on the ground that the acquisition would violate § 7 of the Clayton Act. *See Boyertown Burial Casket Company v. Walco National Corp.,* 344 F.Supp. 1357 (E.D. Pa.1972). The threatened takeover by Amedco would further accelerate this concentration, and we conclude that plaintiff has shown a reasonable likelihood of ultimately proving a violation of § 7.

*The Securities Act Claims*

Section 14(e) of the Securities Exchange Act of 1934 provides:

"(e) It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

■ The overriding purpose of § 14(e) is to protect investors by fair disclosure of certain basic facts to enable them to make an informed decision whether to sell or retain their stock. *See Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31

L.Ed.2d 741 (1972); *Ronson Corporation v. Liquifin Aktiengesellschaft,* 370 F.Supp. 597, 601 (D.N.J.1974) *aff'd.* 497 F.2d 394 (3d Cir. 1974). A Williams Act violation occurs when a tender offer misstates and omits to state material information. As stated in *Sonesta Int'l. Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 251 (2d Cir. 1973):

"The materiality of facts allegedly misstated or omitted depends, in turn, upon whether a reasonable investor might have considered them to be important in deciding whether to accept the tender offer."

*See also Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). In addition, the materiality of omissions and misstatements must be scrutinized on a case by case basis, taking into consideration all the circumstances surrounding the transaction:

"[W]hether facts are material * * when the facts relate to a particular event * * * will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity."

*Sonesta, supra,* 483 F.2d 254, quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir. 1968), *cert. denied* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■ In the context of a preliminary injunction sought on the basis of an alleged violation of the Williams Act,

"The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Sonesta, supra,* 483 F.2d 250, quoted in *Ronson Corp. v. Liquifin Aktiengesellschaft,* 483 F.2d 846, 851 (3d Cir. 1973)

*cert. denied* 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). Moreover, the public interest and potential harm to third persons must be considered. *Delaware River Port Authority v. Trans America Trailer Transport, Inc.,* 501 F.2d 917 (3d Cir. 1974).

 Measuring the tender offer and the letter of January 6, 1976, against these standards, we have concluded that Boyertown has sustained its burden on the Williams Act allegations. The omissions and misstatements are material and the right of the shareholders to fair and accurate disclosure has not been fully and completely served.

*Irreparable Harm*

 Finally, we turn to the issue of irreparable harm. In this case, we are faced with a proposed acquisition of a company which will have far-ranging consequences should immediate relief not be granted. Briefly spoken, the weight of the evidence establishes irreparable harm in the use of executive time spent in resisting the offer, the effect upon salesmen's performance in the market, the lack of customer confidence in Boyertown's future, the obvious effect upon employee morale and like considerations. Additionally, the nation-wide market involved, ultimate and potential harm to third persons and the public interest support such conclusion.

Accordingly, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Boyertown is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at Boyertown, Berks County, Pennsylvania, and is the issuer of common stock registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78*l*, and owned by approximately 854 shareholders.

2. Amedco is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 726 South College Street, Springfield, Illinois, and is the issuer of common stock registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78*l*.

3. Boyertown is the fourth largest manufacturer of burial caskets in the United States, with casket sales of approximately $16,000,000 for the year ending June 30, 1975. Boyertown's sales represent about four (4) percent of the national casket market.

4. On December 22, 1975, Amedco mailed an offer to purchase outstanding shares of common stock of Boyertown for cash at $16.00 net per share (hereinafter referred to as "the Offer").

5. Three types of firms manufacture caskets. Some perform all fabrication and manufacturing steps and sell completed units to funeral directors. Some fabricate shells or parts and sell them to the third type, comprised of manufacturers or "finishers" who complete the units and sell them to their customers, the funeral directors. A number of manufacturers distribute on a state or regional basis, and many have only local distribution. Relatively few are basic manufacturers who sell at all levels.

6. At current rates, there are about 1,900,000 deaths annually in the continental United States. The market for burial caskets approaches approximately 95% of all mortalities. In terms of dollars, casket sales to funeral directors totalled approximately $328,000,000 in 1972, and approximately $393,000,000 in 1974.

7. Boyertown sells a complete line of burial caskets.

8. Boyertown is the only manufacturer which sells a complete line of wooden shells to finishers or jobbers.

9. Since 1969 Amedco has acquired the stock or operating assets of the following companies engaged in the manufacture or distribution of burial caskets and related products, including embalming fluids, funeral cosmetics, funeral home equipment and burial garments:

Springfield Casket Manufacturing Co., d. b. a. Central States Stamping Company

Ozark Casket Supply, Inc.

Preference Casket Manufacturing Co.

Royal Bond, Inc.

Edwards Equipment Co.

E. F. Esser & Sons Casket Company

Lockwoven Company

10. For the year ending December 31, 1974, Amedco sold about $75,000 in burial caskets in the Commonwealth of Pennsylvania; for the six months ended June 30, 1975, Amedco sold burial caskets in the Commonwealth of Pennsylvania at an annual rate of approximately $80,000.

11. Amedco's total sales for all of its funeral equipment and supplies for the year ending December 30, 1974, were $15,282,000, and its total sales for that year include approximately $8,186,480 in burial casket sales.

12. Amedco's sales of burial caskets represent approximately two percent (2%) of the national dollar market for burial caskets, and three percent (3%) of the national burial casket production; Amedco's burial casket operations are among the largest in the United States. Amedco ranks as the ninth or tenth largest in the casket industry in the United States.

13. Amedco has stated that the purpose of the offer is to obtain control of Boyertown through the acquisition of a minimum of 51% of Boyertown's common stock and to the extent it acquires Boyertown common stock, it intends to seek appropriate representation on the Boyertown Board of Directors at the earliest opportunity.

14. In addition to the Amedco acquisitions (see finding of fact No. 9) three of the four largest firms in the United States have made the following acquisitions in recent years:

| Acquiring Company | Acquired Company |
|---|---|
| Batesville (nation's largest) | Hubbard Casket Co. (San Diego, California) |
| | West Coast Casket Co. (Los Angeles, California) |
| | Merrivale, Inc. (Nashua, New Hampshire) |
| National (second largest) | Wm. Abbe & Son, Inc. (Toledo, Ohio) |
| | Belleville Casket Co., Inc. (St. Louis, Missouri) |
| | A. J. Boyd Co. (Prophetstown, Illinois) |
| | California Casket Co. (Cloverdale, California) |
| | Cream City Casket Co. (Milwaukee, Wisconsin) |
| | Duluth Burial Casket Co (Duluth, Minnesota) |
| | Flint-Rex-Art Co. (Kansas City, Kansas) |
| | Linahan Casket Co. (Mt. Vernon, New York) |
| | United States Casket Co. (Pittsburgh, Pennsylvania) |
| Simmons (third largest) | Boston Burial Case (Boston, Massachusetts) |
| | Brenner Burial Casket (Chicago, Illinois) |
| | Elgin Metal Casket Co. (Elgin, Illinois) |
| | York-Hoover Company (York, Pennsylvania) |

15. Hubbard Casket Co. had annual sales of approximately $5,000,000, while West Coast Casket's sales were somewhat less than Hubbard's; prior to Batesville's acquiring them, both West Coast Casket and Hubbard had, themselves, acquired about ten California casket companies. Merrivale also had annual sales of under $5,000,000. Boston Burial Case had annual sales of just under $3,000,000, and Brenner Burial Casket had annual sales of between $1,000,000 and $6,000,000. Hubbard, West Coast, Merrivale, Boston Burial, Linahan, and Brenner have all been acquired since 1971. In addition, Texas Coffin, one of the nation's largest regional casket companies, has acquired a number of casket firms in the Texas-Louisiana area in the past ten years.

16. The national dollar market shares of the four largest casket manufacturers in 1971 and 1974 were as follows:

| | 1971 | 1974 |
|---|---|---|
| Batesville | 11% | 18% |
| National | 7% | 8% |
| Simmons | 4% | 6–7% |
| Boyertown | 5% | 4% |
| | 27% | 36–37% |

These market shares show a trend toward concentration of 33% in only three years.

17. Approximately ten to twelve companies sell burial caskets nationwide, among them Batesville, National, Simmons (through its four wholly-owned burial casket subsidiaries), Boyertown, Aurora and Amedco (through its wholly-owned subsidiary, American Funeral Supply Corp.)

18. There is a marked tendency toward concentration in the casket industry. The total number of casket companies has declined from 571 in 1959 to 450 in 1975, and less if commonly-owned entities are eliminated. The decline has been more severe among larger units which have the most impact on prices.

19. Boyertown sells a complete line of burial caskets at low-, medium-, and high-price levels as does Amedco.

20. Boyertown employs approximately forty-five (45) field burial casket salesmen in the United States, and operated sixteen branches around the country as of June 30, 1975. Since June 30, 1975, Boyertown has opened a branch in Tampa, Florida, and has begun intensive activity to open branches in central Illinois, which would serve the Chicago and St. Louis area, Atlanta, Georgia, and Richmond, Virginia. Boyertown has seventeen trailer trucks to deliver its caskets nationwide. Boyertown also sells its caskets to jobbers and distributors throughout the United States.

21. For the year ended December 31, 1974, Amedco sold caskets in all of the fifty States except Vermont and Arizona; for the year ended June 30, 1975, Boyertown sold caskets in all but seven of the fifty States.

22. Amedco employs sixty-seven (67) salesmen who sell burial caskets throughout the United States. Amedco, as of December 31, 1974, utilized warehouse facilities for casket distribution in Chicago, St. Louis, Los Angeles, Akron, Franklin (Mass.), Tarpon Springs and Sarasota, Florida, Greensboro and Charlotte, North Carolina, Port Ewen, New York, and Wilkes-Barre, Pennsylvania.

Amedco, since December 31, 1974, has closed some of these warehouse facilities, but it has thirty-four trailer trucks, which make it possible to ship caskets nationwide from central locations.

23. Amedco, through American Funeral Supply Corp., advertises its burial caskets in the nationally-circulated monthly publication, *American Funeral Director.*

24. Boyertown and Amedco compete nationally in the sale of burial caskets.

25. A combination of Boyertown and Amedco would hold about 6.0% of the national market for burial caskets, and would represent the largest merger or acquisition in the casket industry.

26. The sale of burial caskets concentrates in population centers, owing to the industry's dependence on areas of substantial annual mortalities.

27. Both Boyertown and Amedco maintain branches and distribution centers in the Los Angeles-Long Beach, California, Standard Metropolitan Statistical Area ("SMSA"), as well as salesmen in that SMSA.

28. Both Boyertown and Amedco have sold a substantial number of units in the Los Angeles-Long Beach SMSA.

29. Deaths in the Los Angeles-Long Beach SMSA according to the *Statistical Abstract* are approximately 61,500 annually. Using 61,500 as the maximum potential market for burial caskets in this SMSA, Boyertown and Amedco unit market shares for this SMSA in 1974 and 1975 were as follows:

| | 1974 | 1975 |
|---|---|---|
| Boyertown | 6.0% | 5.8% |
| Amedco | 4.1% | 4.5% |

30. Boyertown and Amedco compete in the Los Angeles-Long Beach SMSA.

31. Based upon the above data, a combination of Boyertown and Amedco would result in a single company with 10.3% of the Los Angeles-Long Beach SMSA market.

32. The evidence shows a trend toward concentration in the Los Angeles-Long Beach SMSA. In addition to West

Coast Casket Co., (see finding of fact No. 14), the following other casket companies in the Los Angeles-Long Beach SMSA have ceased since 1965 to operate as independent entities: Banner Casket Co., Enterprise Casket Co. (Lynwood, Zip Code 90262), Ferrell Enterprises Casket Co., Hollywood Casket Co. (Santa Fe Springs, Zip Code 90670), Quality Casket Co. (Beverly Hills, Zip Code 90200), Watson & Sons Casket Co. (Inglewood, Zip Code 90300). Only El Monte Casket Co. and Greenacre Mfg. Co. have begun business during the same period.

33. Amedco's tender offer indicated that Amedco "does not" "directly" compete with Boyertown. We have found otherwise. (See findings of fact Nos. 24 and 30)

34. The offer improperly stated that Amedco's acquisition of Boyertown "would not violate the antitrust laws" in view of the evidence here presented. (See findings of fact Nos. 25 and 31)

35. Boyertown sued Walco National Corporation at C.A. No. 72–875, Eastern District of Pennsylvania, to enjoin an attempted takeover as violative of Clayton Act § 7, and this suit is hereinafter referred to as the "*Walco* litigation".

36. (a) The Amedco offer stated that Boyertown "was not successful in obtaining an injunction" in the *Walco* litigation;

(b) Chief Judge Lord's order of June 23, 1972, enjoined Walco, *inter alia,* from making any tender offer for Boyertown's shares, and Walco, pursuant to Chief Judge Lord's order of July 17, 1972, remains enjoined permanently from, *inter alia,* "taking any action to effectuate or promote a tender offer, merger or other acquisition with respect to the shares or assets * * * of Boyertown Burial Casket Company" [see Record in the *Walco* litigation].

37. (a) The offer stated that Chief Judge Lord in the *Walco* litigation merely held that "serious questions would arise under the antitrust laws" if Walco were permitted to acquire control of Boyertown;

(b) Chief Judge Lord specifically held that Boyertown "established a reasonable probability that it will ultimately prevail on the merits at trial that the acquisition of Boyertown would violate § 7 of the Clayton Act" [*Boyertown v. Walco*, 344 F.Supp. 1357, 1363].

38. The offer omitted to state that § 515 of the Pennsylvania Business Corporation Law gives dissenters to a merger or acquisition the right to the "fair value" of their shares.

39. On January 6, 1976, Amedco mailed a letter to Boyertown's shareholders (hereinafter referred to as "the letter").

40. (a) The letter stated that Boyertown's stock has not been sold in excess of $16 "during the past three years";

(b) Beginning on December 31, 1975, and continuing to the time of the hearing, the high bid and asked prices quoted in the "pink sheets" were 16½, 18½, respectively. The letter omitted to cite these quotations although published daily by the National Association of Securities Dealers with which Mr. Forkin, Financial Vice President of Amedco, was familiar.

41. The letter stated that, in the event of a merger, Boyertown shareholders would have dissenters' rights only "under some circumstances" which we find, under the evidence here presented, to have been insufficient considering the provisions of § 515 of The Pennsylvania Business Corporation Law.

42. Amedco's letter stated that, if Amedco acquires control of Boyertown, it may "make changes in the management of the Company", and then immediately added the statement,

Accordingly, the officers and directors of Boyertown may have different and personal interests and concerns apart from your own which you should consider as you decide whether to accept our offer;

when, as a matter of fact, on December 18, 1975, Mr. Hunter, Chairman of Amedco, and Mr. Forkin met with Boyertown's Clarke and Havelka, and during the course of that meeting Mr. Hunter

stated that, if Amedco acquired Boyertown, (1) present management would be retained, and (2) Mr. Clarke would be considered to run Amedco's "entire casket empire". Amedco's letter failed to state these facts.

43. Amedco's offer has affected executive time spent in resisting the offer, salesmen's performance in the market, customer confidence in the continued existence of Boyertown and may affect employee morale.

44. Should Amedco obtain sufficient Boyertown shares to elect a representative to Boyertown's Board of Directors, such a representative would assuredly obtain highly sensitive competitive information which could injure Boyertown's position in the market place.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter: 15 U.S.C. §§ 15, 26 and 78aa.

2. Venue is proper in this district: 15 U.S.C. §§ 22, 78aa, and 28 U.S.C. § 1391(b).

3. The manufacture and sale of caskets represents a line of commerce within the meaning of § 7 of the Clayton Act, 15 U.S.C. § 18.

4. Viewed in terms of a nationwide market, the effect of the acquisition of Boyertown by Amedco may substantially lessen competition in the manufacture and sale of caskets.

5. The metropolitan area of the Los Angeles-Long Beach Standard Metropolitan Statistical Area ("SMSA") is a "section of the country" within the meaning of § 7 of the Clayton Act.

6. The effect of the acquisition of Boyertown by Amedco may substantially lessen competition in the Los Angeles-Long Beach SMSA.

7. Amedco's acquisition of Boyertown would violate § 7 of the Clayton Act.

8. Amedco's offer contains untrue statements of material facts and omits to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

9. Amedco's letter to Boyertown shareholders, dated January 6, 1976, contains untrue statements of material facts and omits to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

10. Amedco's offer and January 6, 1976, letter were issued in connection with a tender offer or request or invitation for tenders of Boyertown common stock and violated the provisions of § 14(e) of the Securities Exchange Act.

11. Boyertown has established a reasonable probability of success in the trial on the merits.

12. Boyertown will suffer irreparable harm unless a preliminary injunction is entered, and is entitled to that injunction.